[Civ. No. 9330. First Appellate District, Division Two.—July 18, 1934.]

GERTRUDE H. AUSTIN, as Executrix, etc., Respondent, v. ALICE BURNS, Appellant.

Porter C. Blackburn for Appellant.

Irving P. Austin for Respondent.

SCHMIDT, J., *pro tem.*—The complaint in this case filed by respondent as the executrix of the estate of Thomas Murphy, deceased, was for cancellation of a deed purported to have been given by said Murphy in his lifetime to Alice Burns, the appellant herein, charging that the purported deed had been obtained from said Murphy by undue influence. After hearing all the evidence in the case upon motion of the respondent the trial court permitted her to file an amended complaint to conform to proof setting up the additional ground of nondelivery of the deed. The complaint also asked for judgment for the rental value of the property from the date that appellant took possession. The court found for respondent that the purported deed had been obtained by undue influence; that there was not any consideration for the deed; that the deed had not been delivered and found that the rental value of the premises during the period occupied by appellant was $1170 and entered judgment for the cancellation of the deed and for the sum of $1170. The appeal is from this judgment.

Although appellant attacks substantially every finding of the court and the judgment thereon, these attacks may. be stated as insufficiency of the evidence to support the findings (a) that appellant procured the purported deed through undue influence; (b) that the purported deed had not been delivered; and (c) for the rental value of the premises.

The testimony showed that the alleged grantor, Thomas Murphy, died on the thirty-first day of December, 1928, aged eighty-six; that the date of the deed involved herein was twelve days prior thereto, namely, the eighteenth day of December; that at the date of the deed said Murphy owned two pieces of property which for convenience will be designated as the Orange Street or his home property, located in the town of Compton, and the other the Stockwell Street property, located a few blocks therefrom in the county of Los Angeles, the said Stockwell property being the property described in the deed involved herein; that said Murphy and the defendant had been acquainted for a year or more prior to his death and that they lived next door to each other on Orange Street.

Appellant testified that during the earliest part of her acquaintance with Murphy he was ill; she took food to him and otherwise took care of him; that she went into his home "every day when I came home at noon from the store, I went in there and fed him . . . and in the morning I would wash his face and hands and give him whatever he wanted, and at night when I came home I did the same thing, I fed him . . . "; that he soon recovered from his temporary illness and their friendship continued. " . . . he used to come in and eat when I came home at noon; he didn't have breakfast with me at all, but at noon he came in and had lunch with me, and at night when I came home he would come in and have dinner with me, and if he didn't come in, I brought it in to him." This continued "as long as I lived there . . . Well, no, not every day . . . he would come in for quite a while steady, and then all of a sudden . . . he wouldn't come in for awhile . . . and then he would come in again." During this relationship between them no discussion was had between them about any property except about three months prior to his death and then in connection with some error regarding a cloud on the title

to one of his pieces of property which he had asked appellant to help him to straighten out, concerning which property he wanted to make a loan, and that she went with Mr. Murphy to see a Mr. Erickson concerning the error; that she had loaned money to Murphy at times when he needed it without any apparent expectation of receiving it back. She did not keep account of the money she either loaned him or that she gave him; that some months prior to his death Murphy told her he desired to remember her by deeding her the Stockwell property, the property in question. "Q. . . . now, what was stated by Mr. Murphy? . . . A. Well, I don't know; I can't remember. Q. Just as near as you can recall? A. I know he told me he wanted me to have that deed to that property because that I had been kind to him and did everything; things that nobody else would have done for him, and I came to him and took care of him when nobody else did. . . . He told me that several different times."

That Murphy was acquainted with a real estate man named Nygaard. When he wanted the deed executed, "Why, he told me to get Mr. Nygaard; . . . he wanted Mr. Nygaard to come to him; . . . he wanted to make some papers out; . . . I went and got Mr. Nygaard. . . . Mr. Nygaard told him to get a lawyer." Mr. Nygaard told the deceased to get a Mr. Aylmer as an attorney. "Q. . . . did Mr. Nygaard get the lawyer? A. No, Mr. Nygaard told Mr. Murphy to get Mr. Aylmer, or to get a lawyer, and I told him I didn't know any lawyers, and Mr. Nygaard told Mr. Murphy to get Mr. Aylmer. . . . Q. . . . then did you see Mr. Aylmer; . . . A. Well, Mr. Aylmer went down to Mr. Murphy's; I don't know if it was that day or the next day, but I know he went down."

Mr. Nygaard testified "Mr. Murphy asked me to draw a deed in favor of Mrs. Burns; he said he would like to deed his Orange street property, . . . and I stepped outside of the house and I talked to Mrs. Burns, and I advised Mrs. Burns, under the circumstances, that she better consult an attorney and have a deed drawn up and have the transaction handled by an attorney. She asked me what attorney I would recommend; I said 'There are several up town; Mr. Aylmer is very reliable; you might see him.'" At the time he had conversation with Mr. Murphy "Mrs. Burns was

there, but, however, she went out before—she stepped **out** of the kitchen, on the rear porch, as I remember; she was in the other room part of the time."

The record shows that the appellant Mrs. Burns, went to the office of Mr. Aylmer, an attorney, and had him prepare a deed and then took Mr. Aylmer with her to Mr. Murphy. Mr. Aylmer testified: "Yes, I asked him if he really wanted to deed the property to her and he said he did . . . after I found out that it was his wish to sign that deed, I said 'We will have to have a notary;' . . . he wanted to have it cleared before he gave her a deed." Aylmer was not present when the deed was signed.

The witness Mrs. Olive Harr testified that she was the notary who placed the certificate on the deed involved herein; that she first saw the deed at the bank where she worked; that Mrs. Burns asked her to go to Mr. Murphy's house; that she saw him sign the deed, but did not have any conversation at all with Mr. Murphy; that she took the deed back to the bank where she placed her notary seal on it; that she then gave the deed to Mrs. Burns. "The Court: Do you remember whether he told you to give it to Mrs. Burns? A. I don't remember that he did. Q. Why did you give it to her? A. Well, it was made out to her."

One witness, Carrie Dimmler, testified she had known Mr. Murphy for six or seven years; had seen him frequently almost every day; that he was an old man; that she talked to him occasionally; that she had observed him; that "he was a very feeble old man". When questioned as to his mental condition she answered, "He was very feeble. . . . Well, he was childish. . . . "

Another witness, Mrs. Delia Guay, testified that she had known Mr. Murphy for seven or eight years; had frequently attended the same church; the last two years had seen him every day while he was able to be around; that she conversed with him nearly every morning; that he was very feeble; "I thought he was getting childish; I saw it myself the last two years."

Mrs. Ella Pindle testified she was a professional graduate nurse; she lived next door to Mr. Murphy; that she saw him every day, sometimes two or three times a day; she had rendered assistance to him, given him food and waited on him; she had had him over to her house for meals and

also had taken meals to him; she had loaned him money. When she had first known him he had been in good health and later had become childish and in a senile stage; that he was easily led; that Mr. Murphy died at her house; that Mr. Murphy was brought by her and her husband to her home on the nineteenth day of December, eleven days before he died; and that he was in bed all the time; that she was present at the time his will was drawn; that she testified at the hearing for the probate of the will; that she believed that at the time the will was signed he was of sound mind and that he was not acting under any duress or undue influence or fear; that Mrs. Burns went to business in the morning, came back at noon, would go away again and stay until about 6 o'clock.

Mrs. Nell Goodran testified that she knew Mr. Murphy for about a year before he died; that she lived the second house away from him; she talked with him frequently; that in her opinion the condition of his mind was all right; that as far as she knew he talked intelligently; she had never visited him at his house, but had been to the door of the kitchen.

Alfred H. Elliott testified that he knew Mr. Murphy several years up until just before he died; that about six months before he died Mr. Murphy had told him how much he thought of Mrs. Burns and what he was going to do for her; "that he had a little home down there that he wanted to leave to Mrs. Burns for her old age"; that he saw Mr. Murphy after he had signed the deed, he believed the next evening, and Mr. Murphy then said, "I have done what I have been wanting to; now the little home belongs to Mrs. Burns. I gave it to her." When asked his opinion as to his mental condition he answered "I couldn't see any difference from the first time I met him until up towards the last . . . "

William C. Elliott testified that Mr. Murphy had told him of the kindness of Mrs. Burns and that she would be rewarded some day for her kindness. He had known Mr. Murphy about six months before he died and in his opinion he was rational; that he did not know anything about his making a deed to Mrs. Burns.

(1) From the foregoing statement of facts it is apparent that the evidence in the case is in decided conflict as to the

mental state of Thomas Murphy at the time the purported deed was signed by him as well as to whether any undue influence had been used by appellant. Reviewing courts of this state have so repeatedly held that where there is such a conflict in the testimony the reviewing court will not disturb the finding of the trial judge, that citation of authority is not necessary.

Also, the record discloses many inconsistencies in the testimony of appellant as given at the trial and as given by her in a deposition. It is quite probable that the trial court discredited her story. Without her testimony she would not, in any event, have proved a defense to the action.

(2) There is ample evidence in the record to support the finding of the nondelivery of the deed.

(3) The objection to the finding of the rental value of the property and the objection to the judgment thereto is not well taken for the complaint alleged that the rental value of the property was $30 per month and no issue was made thereof by the answer. Therefore same was deemed to have been admitted by appellant and it was not necessary for respondent to introduce any evidence whatever as to the rental value.

Judgment affirmed.

Nourse, P. J., and Spence, J., concurred.